UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ASSET PROTECTION PLANS, INC.,

    Plaintiff,

v.                                            CASE NO. 8:11-cv-440-T-23MAP

OPPENHEIMER & CO., INC.,

    Defendant.
_____/

## **ORDER**

    Asset Protection Plans, Inc., ("APP") sued (Doc. 2) Oppenheimer & Co., Inc., ("Oppenheimer") in state court for alleged violation of the Securities Exchange Act of 1934 and the Florida Securities and Investor Protection Act, and for negligence, breach of fiduciary duty, fraud, and conversion.

    Oppenheimer removed (Doc. 1) based on diversity jurisdiction under 28 U.S.C. § 1332, and APP amended the complaint. (Doc. 7)  Oppenheimer moves (Doc. 11) to dismiss ten of the fourteen claims and moves to strike the demand for attorney fees.  APP responds in opposition and requests to again amend the complaint. (Doc. 14)

## BACKGROUND[1]

In 2009, Joseph Vaccaro ("Vaccaro") telephoned the president of APP, a Florida investment business, with a proposition. Vaccaro, a financial advisor with Wells Fargo Advisors, LLC, wished to arrange a transaction by which APP would provide a short-term loan to athletes who anticipated a signing bonus from an NFL team but, while awaiting the signing bonus, needed money for training, re-location, and living expenses. APP agreed to the loans, which were secured by the prospective signing bonus and were guaranteed by the athlete, the athlete's agent, "and possibly others"; approximately $75,000 was lent, and each athlete re-paid the loan.

In January, 2010, Vaccaro, who had moved to Oppenheimer, proposed another transaction. Five new NFL prospects sought loans that together were several times larger than APP's earlier loans. Believing the transaction too large and too risky, APP initially declined. Vaccaro insisted the transaction was safe due to Vaccaro's expertise, Oppenheimer's support, and the direct deposit of each prospect's salary into an Oppenheimer account. In response to APP's objection to the size of the transaction, Vaccaro offered APP a loan from Oppenheimer. During the ensuing negotiations, APP required the prospects' sports agency, Willis & Woy Sports Group, LLC, ("Willis & Woy") to guarantee the loans. In addition, APP required Willis & Woy's owner Jordan Woy and agent Horace Smith to provide a personal guarantee. APP also investigated Willis & Woy, Woy, and Smith.

---

[1] At this stage the well-pleaded facts alleged in the complaint are assumed true. Beck v. Deloitte & Touche, 144 F.3d 732, 735 (11th Cir. 1998).

Agreement was achieved and six promissory notes issued between February and May, 2010.  Three of the promissory notes ("the notes") defaulted and are the subject of the instant dispute.  Issued to Perrish Cox, Daryl Washington, and Brian Jackson (together, "the prospects"), each note was (ostensibly) signed by one of the prospects, Willis & Woy, Jordan Woy, and Horace Smith.  Each note requires direct deposit of payment and provides that the principal, closing costs, and a flat rate of interest are due on demand beginning approximately five-and-a-half months after issuance.  Each signer is jointly and severally liable.  With the two largest notes are UCC financing statements that evidence APP's lien against the "present and future personal property, accounts, assets . . . and fixtures" of the signer.

In total, $206,250 is due on Cox's note, $125,000 is due on Washington's, and $62,500 is due on Jackson's.  APP received $28,805, apparently from Horace Smith, leaving a balance due of $364,945 plus late fees and costs.  Jordan Woy and the prospects deny any knowledge of the transaction and claim the signatures on the notes are a forgery.  APP demanded repayment from Oppenheimer, which refused.

## DISCUSSION

Oppenheimer asserts that the claims alleging negligent hiring (count II); breach of fiduciary duty (count III); violation of the Florida Securities and Investor Protection Act (counts VI - X); violation of the Securities Exchange Act of 1934, Section 10(b), and Rule 10b-5 (count XI); conversion (count XII); and civil theft (count XIV) fail to state a claim.  Oppenheimer moves to strike each demand for attorney fees.

"[A] complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009). Labels and conclusions alone are insufficient. Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007).

### 1. Securities Exchange Act of 1934 (count XI)

Oppenheimer argues the promissory notes APP purchased are not a "security" as defined in the Securities Exchange Act of 1934 ("SEA"), section 3(a)(10), codified at 15 U.S.C. § 78c(a)(10). If the notes are not securities APP cannot invoke Section 10(b) or Rule 10b-5 of the SEA.

Section 3(a)(10) provides, "unless the context otherwise requires – . . . . The term "security" means any note . . . ." 15 U.S.C. § 78c(a)(10). However, "any note" is not interpreted literally. Reves v. Ernst & Young, 494 U.S. 56, 63 (1990). Congress's legislative purpose, specifically, "to regulate *investments*, . . ." informs the scope of "any note." See Reves, 494 U.S. at 61-63 (emphasis in original). Whether a note is a security depends on whether, given "the economic reality" of the transaction, the note functions as an investment. See Reves, 494 U.S. at 62-65.

Consequently, although section 3(a)(10) presumes that a note is a security, the presumption is rebutted if the note is, or bears a strong resemblance to:

> [a] note delivered in consumer financing, [a] note secured by a mortgage on a home, [a] short-term note secured by a lien on a small business or some of its assets, [a] note evidencing a 'character' loan to a bank customer, [a] short-term note . . . secured by an assignment of accounts receivable, . . . a note which simply formalizes an open-account debt incurred in the ordinary course of business (particularly if, as in the case of the customer of a broker, it is collateralized),

or a note "evidencing loans by commercial banks for current operations." 494 U.S. at 65 (quoting Exchange Nat. Bank of Chicago v. Touche Ross & Co., 544 F.2d 1126, 1138 (2d. Cir. 1976) (Friendly, J.)).  Whether a contested note bears a strong resemblance to a note listed in Reves depends on (1) "the motivations that would prompt a reasonable seller and buyer to enter" into the transaction, (2) "the 'plan of distribution' of the instrument," (3) "the reasonable expectations of the investing public," and (4) "whether some factor . . . significantly reduces the risk of the instrument, thereby rendering application of the Securities Acts unnecessary." Reves, 494 U.S. at 66-67; see also id. at 67 ("whether another category should be added [to the list] is to be [decided] by examining the same factors").

The notes at issue were sold so the prospects could "pay for their training, relocation and other living expenses incurred prior to their receipt of signing bonuses and other compensation." (Doc. 7, ¶ 11A)  The notes therefore are, or are highly similar to, notes "delivered in consumer financing."  Although due on demand and potentially indefinite in duration, see Reves, 494 U.S. at 72-73, the notes provide a flat rate of interest (such that the lender cannot receive more interest by holding the notes longer) and were likely to be called as soon as allowed, less than six months after issuance. APP would have demanded payment within a year at the longest, because the prospects were not obligated after a year to maintain a direct deposit account with Oppenheimer.  Thus, "the economic reality" is that the notes are short-term.[2]  The notes

---

[2] "[T]he court may consider a document attached to a motion to dismiss without converting the motion into one for summary judgment if the attached document is (1) central to the plaintiff's claim and (2) undisputed. Day v. Taylor, 400 F.3d 1272, 1276 (11th Cir. 2005) (citing Horsley v. Feldt, 304 F.3d 1125,
(continued...)

- 5 -

are secured by the guarantee and the assets of Willis & Woy, such that the notes are similar to a "short-term note secured by a lien on a small business or some of its assets." Finally, the two largest notes are secured both by a prospect's anticipated income and by Willis & Woy's future accounts, in which respect the two largest notes are akin to a "short-term note secured by an assignment of accounts receivable."

The Reves factors confirm that the notes are not a security. Regarding the motivation of the parties, Reves states:

> If the seller's purpose is to raise money for the general use of a business enterprise or to finance substantial investments and the buyer is interested primarily in the profit the note is expected to generate, the instrument is likely to be a "security." If the note is exchanged to . . . correct for the seller's cash-flow difficulties, or to advance some other commercial or consumer purpose . . . the note is less sensibly described as a "security."

494 U.S. at 66. The NFL prospects sought a loan predominantly to cover expenses until each began to receive income as a professional athlete. To the prospect the note was a personal loan easing the need for money. Cf. Martin Lipton & George A. Katz, "Notes" Are Not Always Securities, 30 Bus. Law. 763 (1974-75), at 766-67 ("if the note was issued to pay for . . . a personal loan it is not a security") and 770 (characterizing as an "absurd result" the extension of the securities laws to a one-year personal loan). On the other side, APP argues that, despite a flat interest rate, the prospect of a profit

---

²(...continued)
1134 (11th Cir. 2002). The notes are attached to the complaint and central to APP's claims. APP does not dispute the notes' terms, and the terms contradict the possibility that the notes would be held for more than a short period. See Tcherepnin v. Knight 389 U.S. 332, 336 (1967) ("form should be disregarded for substance and the emphasis should be on economic reality" when interpreting the boundaries of a "security"); see also Griffin Industries, Inc. v. Irvin, 496 F.3d 1189, 1205-06 (11th Cir. 2007) ("Our duty to accept the facts in the complaint as true does not require us to ignore specific factual details of the pleading in favor of general or conclusory allegations. Indeed, when the exhibits contradict the general and conclusory allegations of the pleading, the exhibits govern.") (citations omitted).

- 6 -

motivated purchase of the notes.  See Reves, 494 U.S. at 68 n.4; cf. S.E.C. v. Edwards, 540 U.S. 389, 395-96 (2004).  Even if APP was motivated by profit, the notes are not necessarily a security.  On the one hand, in Bass v. Janney Montgomery Scott, Inc., 210 F.3d 577, 585 (6th Cir. 2000), in which one party sought a typical commercial loan and the other sought profit, the first Reves factor favored neither side.  On the other, in Banco Espanol de Credito v. Security Pacific Nat'l Bank, 973 F.2d 51, 55 (2d Cir. 1992), one party sought short-term credit while another sought profit; yet under the first Reves factor the note was not a security.  Banco applies more powerfully to the present action because, although "[i]n one sense every lender of money is an investor since he places his money at risk in anticipation of a profit in the form of interest," C.N.S. Enterprises, Inc., v. G & G. Enterprises, Inc., 508 F.2d 1354, 1359 (7th Cir. 1975), the notes at issue here are most fittingly conceived as a loan.  The note was almost certainly short-term, the borrower had to re-pay the note in full even if the prospect's career failed, and the note would not appreciate if the prospect succeeded.  See United American Bank of Nashville v. Gunter, 620 F.2d 1108, 1118 (5th Cir. 1980).[3]  Each note is written in the manner of a loan, designates the buyer as "Lender/NoteHolder," the seller as "Borrower," and the money lent as the "Loan Amount."  The transaction "shows all of the economic context of a temporary loan . . . , not a permanent or semi-permanent source of capital investment with which to operate a major long-term . . . venture . . . ."  Singer

---

[3] Reves states that the "family resemblance" test and investigation of whether a note was issued in an "investment" or a "commercial" context are "two ways of formulating the same general approach." See Reves, 494, U.S. at 63-64.  Cases pre-dating Reves which analyze whether a note is an investment or a commercial transaction can therefore provide persuasive authority.

- 7 -

v. Livoti, 741 F.Supp. 1040, 1050 (S.D.N.Y. 1990). APP and the prospects were motivated accordingly, and under the first Reves factor the notes are not a security.

APP alleges that a desire to generate more business, either from the prospects or other athletes, motivated Vaccaro, Oppenheimer, and the prospects' agents. However, the motives of a third party – including a third party, such as Vaccaro or Oppenheimer, responsible for introducing the contracting parties – receives little or no weight. See, e.g., Bass, 210 F.3d 577; Banco, 973 F.2d 51, 55. A speculative hope for future business receives no weight. See, e.g., Livoti, 741 F.Supp 1040, 1042. Further, even if Vaccaro, Oppenheimer, or the agents' broader design was germane, the primary character of the note remains: a personal loan intended to correct or ensure a prospect's cash flow.

As for the "plan of distribution," a note that is "an instrument in which there is common trading for speculation or investment," Reves, 494 U.S. at 66, is likely a security. APP bought the notes following private solicitation from, and direct negotiation with, Vaccaro. APP offered the notes to no one (and certainly not the general public). APP does not allege Oppenheimer or Vaccaro were trading similar notes or even selling similar notes widely. In sum, "the 'plan of distribution' of the instrument[] need not detain us. There was no such plan." Livoti, 741 F.Supp. at 1050; see also Banco, 973 F.2d at 55; Bass, 210 F.3d at 585.

Nor would the investing public reasonably expect the notes to trade like securities. A negotiated loan is unique and thus typically a poor vehicle for speculative trading. Cf. Marine Bank v. Weaver, 455 U.S. 551, 560 (1982). Each note here is an

extensively negotiated loan.  See (Doc. 7, ¶¶ 14-16).  The de facto short term and flat interest rate further diminish the expectation each note could trade as a security.  Livoti, 741 F.Supp. at 1050.  APP alleges that Vaccaro consistently denominates the notes as an "investment," but Vaccaro's casual semantics fail to govern over applicable law in distinguishing a loan from a security.

At least two factors significantly reduce the risk of the notes at issue, "thereby rendering application of the Securities Acts unnecessary" under the final Reves prong.  The first is that each note is like a traditional loan.  If a loan is negotiated directly between two parties, a main concern of the Securities Acts – that the issuer "has superior access to and control of information" while the investor must rely "solely on semi-anonymous and secondhand market information" – is not present.  See Great Western Bank & Trust v. Kotz, 532 F.2d 1252, 1262 (9th Cir. 1976) (Wright, J., concurring).  The lender, typically a knowledgeable financial institution, enjoys instead the option to demand "wide ranging disclosures and verification of issues material to its decision on [a] loan . . . ."  532 F.2d at 1262 (concurrence).

A lender can also seek concessions from the borrower that decrease the risk of the loan to the lender.  The second factor reducing the risk of the notes here is the guarantees and collateralization APP required before lending.  Collateral significantly reduces the risk of a note, Bass, 210 F.3d at 585, and each note is guaranteed by a prospect, Willis & Woy, Jordan Woy, and Horace Smith.  Each guarantor is jointly and severally liable.  Each prospect pledged to direct deposit his paycheck into an account

controlled by Oppenheimer.  The two largest notes provide APP a lien over the "present and future personal property, accounts, assets . . . and fixtures" of each guarantor.

APP objects that Vaccaro lied about the safety of the transaction and that the guarantees were fraudulent because the prospects and agents deny signing the notes. What matters, however, is the nature of the notes but for this alleged fraud.  Prochaska & Associates, Inc., v. Merrill Lynch Pierce Fenner & Smith, Inc., 798 F.Supp. 1427, 1430 n.2 (D. Neb. 1992).  "Congress, in enacting the securities laws, did not intend to provide a broad federal remedy for all fraud."  Weaver, 455 U.S. at 556.

APP fails to allege a claim under the SEA because no note at issue is a "security" within the meaning section 3(a)(10).

### 2. Florida Securities and Investor Protection Act (counts VI - X)

APP alleges Oppenheimer violated the Florida Securities and Investor Protection Act ("FSIPA") through misrepresentations and omissions in connection with the offer, sale, or purchase of an investment (count VI), the rendering of investment advice (count VII), and the sale of a security (count VIII); the sale of an unregistered security (count IX); and the sale of a security by an unregistered advisor (count X).  See FLA. STAT. §§ 517.301, 517.07, 517.12.

Because "[t]he definition of 'security' under the Florida statute is the same as that under federal law," Phillips v. Kaplus, 764 F.2d 807, 815 n.8 (11th Cir. 1985), counts VIII, IX, and X – fraud connected with the sale of a security, sale of an unregistered security, and the sale of a security by an unregistered advisor – fail for the same reason as APP's SEA claim.  The notes at issue are not a "security."

Counts VI and VII – fraud connected to the purchase of an investment and to the rendering of investment advice – rely on section 517.301, Florida's counterpart to SEA Rule 10b-5. However, though a civil action under Rule 10b-5 can be pursued directly, "[a] similar action under Florida law implements [both] Sections 517.301 and 517.211." E.F. Hutton & Co., Inc. v. Rousseff, 537 So.2d 978, 981 (Fla. 1989). Rousseff explains:

> Because no federal statute exists that allows private parties to obtain civil relief for many of the offenses embraced by rule 10b-5, the federal courts have created such a right. Under Florida law, no court-made implied civil right has been created under section 517.301 because companion section 517.211 contains an express civil liability provision.

537 So.2d at 981. Section 517.211(2) creates liability only for "purchasing or selling a security in violation of [Section] 517.301." FLA. STAT. § 517.211(2). Consequently, invoking section 517.301's reference to the unlawfulness of fraud in connection with "the rendering of any investment advice" or to the sale of "any investment" in a claim for relief is problematic because the statute that provides a remedy, section 517.211(2), recognizes no such harm.

The tension between Section 517.301 and Section 517.211 is best resolved by obeying the plain language of Section 517.211. The same conclusion attaches with regard to whether a "holder" of a security may sue under the FSIPA. Because Section 517.211 states only that a purchaser or seller of a security is entitled to relief for a violation of Section 517.301, a mere "holder" of a security has no claim, even for suffering fraudulent investment advice. Rushing v. Wells Fargo Bank, N.A., 752 F.Supp.2d 1254, 1262 (M.D. Fla. 2010); see also City of St. Petersburg, Fla. v.

Wachovia Bank, Nat. Assn., 2010 WL 2991431 at *4 (M.D. Fla. 2010). Likewise, a purchaser of a note that is not a security has no claim. APP's FSIPA counts fail.

### 3. Conversion (count XII) and Civil Theft (count XIV)

The complaint argues APP's inability to collect on the notes amounts to conversion and civil theft. "[T]he general rule [is] that an obligation to pay money cannot be enforced through an action for conversion." Bel-Bel Intern. Corp. v. Community Bank of Homestead, 162 F.3d 1101, 1109 (11th Cir. 1998). When a contractual right to money specifies no precise source of payment, no claim for conversion exists. 162 F.3d at 1108 (citing Advanced Surgical Technologies, Inc. v. Automated Instruments, Inc., 777 F.2d 1504 (11th Cir. 1985); Gamnolati v. Sarkisian, 622 So. 2d 47, 50 (Fla. 4th DCA 1993); Belford Trucking Co. v. Zagar, 243 So.2d 646, 648-49 (Fla. 4th DCA 1970)); see also, e.g., Gasparini v. Pordomingo, 972 So.2d 1053, 1055 (Fla. 3rd DCA 2008). Although contractually obligated to pay APP on demand, the prospects and agents could obtain the money from anywhere. The complaint fails to state a claim for conversion. The civil theft claim, entirely neglected in APP's response, fails with the claim for conversion. Gasparini, 972 So.2d., at 1056.

### 4. Negligent Hiring (count II)

"Negligent hiring occurs when, prior to the time the employee is actually hired, the employer knew or should have known of the employee's unfitness." Magill v. Bartlett Towing, Inc., 35 So.3d 1017, 1020 n.1 (Fla. 5th DCA 2010). APP asserts Oppenheimer should have known Vaccaro was not suitable for employment. But the facts APP claims Oppenheimer would have discovered through better pre-employment investigation are

nothing more than the wrongs APP alleges Vaccaro committed while working for Oppenheimer.  See (Doc. 7, ¶ 49)

APP seeks to amend the complaint to plead a claim for failure to supervise. Presumably APP means negligent retention.  The current complaint's explanation of the relation between Oppenheimer and Vaccaro is opaque, and includes many conclusory statements, but the complaint provides insufficient detail to show that Oppenheimer had constructive, notice that Vaccaro was unfit or that Oppenheimer unreasonably failed to investigate after receiving such notice.  See Garcia v. Duffy, 492 So.2d 435, 441 (Fla. 2d DCA 1986).  Whether the complaint even sufficiently alleges Oppenheimer owed APP a duty not to negligently retain Vaccaro is doubtful considering Vaccaro began doing business with APP before moving to Oppenheimer.  In any event, APP is granted leave to amend the complaint in order to attempt a claim for "negligent retention."

### 5. Breach of Fiduciary Duty (count III)

The complaint alleges Oppenheimer, through Vaccaro, breached a fiduciary duty to APP.

> In order for a confidential or fiduciary relationship to exist under Florida law, there must be substantial evidence showing some dependency by one party and some undertaking by the other party to advise, counsel, and protect the weaker party. Cripe v. Atlantic First Nat. Bank, 422 So.2d 820 (Fla. 1982) . . . . In an arms length transaction however, there is no duty imposed on either party to act for the benefit or protection of the other party, or to disclose facts that the other party could, by its own due diligence have discovered. Metcalf v. Leedy, Wheeler & Co., 140 Fla. 149, 191 So. 690 (1939).

Lanz v. Resolution Trust Corporation, 764 F.Supp. 176, 179 (S.D. Fla. 1991); see also Mount Sinai Medical Center of Greater Miami, Inc. v. Heidrick & Struggles, Inc., 188 Fed.Appx. 966, 969 (11th Cir. 2006) (holding no fiduciary relation existed in an arms length transaction between equal parties).  Little in the complaint suggests Asset Protection Plans, Inc., was not a sophisticated financial institution that engaged Vaccaro in an arms length transaction.

APP relies primarily on Shields & Co. v. Bright, 254 F.Supp.2d 1253, 1260 (M.D. Fla. 2003).  In Bright, clients who were elderly, uneducated, and not versed in investing relied heavily on a brokerage firm.  Bright is irrelevant.  Further, Bright was reversed in part in an Eleventh Circuit ruling without opinion.  See 99 Fed.Appx. 875 (11th Cir. 2004).  The other case mentioned by APP, Gochnauer v. A.G. Edwards & Sons, Inc., states, "[t]he law is clear that a broker owes a fiduciary duty of care and loyalty to a securities investor."  810 F.2d 1042, 1049 (11th Cir. 1987) (citations omitted).  The transaction here involves no security, see sec. 1, supra, and Vaccaro merely put together a commercial transaction between APP and the prospects and agents; the complaint insufficiently alleges that Vaccaro acted, actually or apparently, as a trusted investment advisor to APP.  Rather, APP had an independent responsibility to assess Vaccaro, the players, the agents, and the overall transaction.  Cf. Banco, 973 F.2d at 56 ("as an arms length transaction between sophisticated financial institutions, the law imposed no independent duty on [the defendant] to disclose information that plaintiffs could have discovered through their own efforts").

The claim for breach of fiduciary duty is dismissed without prejudice.  APP may attempt to allege facts showing APP was not a knowledgeable financial institution but, rather, depended on Vaccaro, that the transaction was not at arms length, and that Vaccaro recognized and accepted the duty of a fiduciary toward APP.

6. Oppenheimer's Motion to Strike Attorney Fees Demands

Oppenheimer moves to strike APP's demand for attorney fees in counts I-V and XII-XIV.  Counts II, III, XII, and XIV fail to allege a claim; Oppenheimer's motion as to those counts is denied as moot.  In the remaining counts APP seeks fees pursuant to Section 57.105, Florida Statutes, which allows an attorney fees award against an attorney who litigates a frivolous claim.  APP alleges no grounds for an award of fees under Section 57.105.  The attorney fees demand in counts I, IV, V, and XIII are stricken.

APP requests to amend the complaint to "include the sufficient language to plead for recovery of [an] attorney's fee[] under any counts."  (Doc. 14, at 19).  This catch-all language is insufficient.  The only basis APP cites for an attorney fee is the "Costs and Expenses" provision of each note, which entitles APP to a reasonable attorney fee from the "Borrower."  The only defendant in this action is Oppenheimer, which is not a "borrower."  APP's request is denied.

## CONCLUSION

APP's motion to dismiss (Doc. 11) is **GRANTED**.  Counts VI-XII and XIV are **DISMISSED with prejudice**; counts II and III are **DISMISSED without prejudice**; and the demand for attorney fees in counts I, IV, V, and XIII are **STRICKEN**.  APP's motion

to amend the complaint is **GRANTED** in order to add a claim for negligent retention and **DENIED** as to a new demand for attorney fees.

ORDERED in Tampa, Florida, on June 27, 2011.

*[signature]*

STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE